**FEDERAL DEPOSIT INSURANCE CORPORATION,**
Plaintiff-Appellant,

v.

**Randy TYREE, Tennesseans For Tyree, Peter Girardin, Georgia Girardin and P. Douglas Morrison, Defendants-Appellees.**

Court of Appeals of Tennessee,
Eastern Section.

July 26, 1985.
Permission to Appeal Denied by
Supreme Court Oct. 21, 1985.

John K. King and Linda J. Hamilton of Morton, Lewis, King & Krieg, Knoxville, for plaintiff-appellant.

Keith McCord and Judy M. Cornett of McCord, Cockrill & Weaver, P.C., Knoxville, for defendant-appellee, Randy Tyree.

Robert L. Crossley of Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, for defendant-appellee, P. Douglas Morrison.

## OPINION

FRANKS, Judge.

In this action to collect promissory notes[1] in the amounts of $110,000.00 and $129,198.23, the trial judge granted summary judgment to Randy Tyree and P. Douglas Morrison. Plaintiff has appealed.

The notes, dated September 30, 1982 and February 11, 1983, were signed "Tennesseans for Tyree" by P. Douglas Morrison, chairman. The plaintiff seeks judgment on the notes against defendants Tennesseans for Tyree, an unincorporated political association, Randy Tyree, candidate for governor in the 1982 election, guarantors Peter and Georgia Girardin, and Morrison, who executed the notes.

The chancellor, in granting summary judgment, said:

Tennesseans for Tyree consisted, at least, of Jesse Barr, Jake Butcher and C.H. Butcher, all of whom maintained offices in the United American Bank Building. The officer of the Bank, Ms. Dempster, states in her deposition that it was understood that Barr was to be obeyed insofar as the Bank was concerned and that no one questioned his authority and it was understood that he spoke for Jake Butcher. It was further stipulated by the parties that Jake Butcher was a Director and CEO of United American Bank. It is clear from the affidavits that Barr approved the loan to Tennesseans for Tyree and following which the loan officer departed from her regular customary procedure concerning the loan.

. . . . .

In the instant case, a campaign committee did exist, however nebulous in number, size and membership for the purpose of raising funds. A loan was extended by United American Bank to this committee. Mr. Morrison signed, clearly, in a representative capacity, as opposed to individually, for a disclosed, existing principal, and the funds were received and expended by the committee.

On appeal, plaintiff insists Tyree authorized the loans, received the benefits of the proceeds from the loans and is obligated to make repayment. Further, that Morrison, as maker of the notes, is liable on the basis he was a member of Tennesseans for Tyree.

Whether members of an unincorporated association are responsible for debts of the association depends upon the type of association involved. An important distinction between profit and not for profit associations is made in *Blair v. Southern Clay Mfg. Co.*, 173 Tenn. 571, 577, 121 S.W.2d 570 (1938):

Whether the members of a voluntary association are to be treated as partners depends on the character of the organization. If the association is organized for profit, the members are partners in legal effect and are liable for debts contracted in the name of the association by other members. [Citations omitted.] If, however, in the operation of such an association, profit and loss is not contemplated, such as literary, social or political organizations, its members are not treated as partners and their liability for debts contracted in behalf of the association is determined upon principles of agency.

■ It has long been the general rule there is no implied liability to the members of a voluntary association not organized for profit on contracts of the association and members may be liable on the contracts only upon the principles of agency. Members of such association may be liable on contracts purportedly made by, for or in the name of the association when the members have given their assent or subsequently ratified the contract. Annot., 41 A.L.R. 754, *Voluntary Association—Contracts;*

---

**1.** Plaintiff acquired the notes after the United American Bank became insolvent.

7 A.L.R. 222, *Voluntary Association—Contracts. Accord: Jim Host & Associates v. Sharpe,* 639 S.W.2d 784 (Ky.App. 1982).

Where a principal obtains the benefit of a loan procured by an agent acting without authority, he thereby ratifies the contract and makes himself liable for the loan. *Calhoun v. Realty Co.,* 129 Tenn. 651, 168 S.W. 149 (1914). In order to establish liability, it must be shown that the principal received the benefit of the proceeds and *Calhoun* notes the proceeds must be "used to increase his money in hand ... or ... to extinguish outstanding liabilities against him." *Id.,* at 654, 168 S.W. 149.

A good discussion of the responsibilities of one who assumes to act as agent for members of an association is found in 1 Meacham, *The Law of Agency,* § 1389:

It is, of course, possible in such a case that the assumed agent may have expressly excluded personal responsibility, or that the person extending the credit may have done so in reliance upon voluntary payments, subscriptions or funds to be raised, but where it does not appear that he has done so, the person who assumes to act will usually be personally responsible. In such cases usually the fact that there is no legally responsible principal will be equally within the knowledge of both parties, ... The question here is, rather, to whom was the credit extended. The rule in such cases, it is said, "is founded upon a presumption of fact, and is not the expression of any positive or rigid legal principle. The presumption referred to is that the parties to a contract contemplate the creation of a legal obligation capable of enforcement, and that, therefore, it is understood that the obligation shall rest on the individuals who actively participate in the making of the contract, because of the difficulty in all cases, the impossibility in many, of fixing it upon the persons taking part in or submitting to the action of the evanescent assemblage. If, however, the person with

whom the contract is made, expressly agrees to look to another source for the performance of its obligations, or if the circumstances be such as to disclose an intention not to charge the agent, as where the other agrees to accept the proceeds of a particular fund, there is no longer reason to indulge the presumption, and it may be rebutted by proof of such facts." There may of course be cases, even in this field, where the lack of legal responsibility may not be apparent, and in which express or implied representations of matters of fact will make the assumed agent liable.

At pp. 1019–20.

Morrison's deposition reveals he was called by Jesse Barr, who is variously referred to as an agent of the United American Bank or Jake Butcher's agent, and Barr requested and instructed Morrison to sign the two notes in blank, which Morrison signed "Tennesseans for Tyree by P. Douglas Morrison, Chairman." Morrison was assured by Barr that no personal liability attached to the execution of the notes. Morrison explained Tyree had advised that Butcher and Barr would be responsible for financing the gubernatorial campaign through Tennesseans for Tyree and it was "understood" that "our organization would raise funds for repayment of notes" but he did not know who would be responsible for repayment of the loans if the funds were not raised. He testified the association named on the note was formed to arrange financing and was organized by C.H. Butcher, Jr., Jake Butcher and Jesse Barr, but he did not know who were other members. He also described it as a different arm of the campaign and considered himself when signing as chairman as an agent of "an association of people". He also testified that he was fund raising chairman of Tyree's election effort but denied he was a member of the association known as Tennesseans for Tyree. He also testified he loaned money to the campaign effort and was repaid and had certain expenses in the course of the campaign reimbursed from the campaign fund which was maintained

in a bank account in the name of Tennesseans for Tyree.[2]

Randy Tyree testified that the name Tennesseans for Tyree was selected in late 1981 or early 1982, and the initial purpose of selecting the name was for disclosure purposes under the Campaign Financial Disclosure Act, T.C.A., § 2–10–101, *et seq.*[3] Tyree testified:

Q. Well, how was it that you know that Jake Butcher and C.H. Butcher and Jesse Barr were in fact members of any organization raising funds and arranging for financing of your campaign?

A. It was United American Bank where I got the loan from for the campaign and they were the ones that arranged that.

. . . . .

Q. Had you requested that money or had you requested that loan to your campaign from the United American Bank?

A. Yes, the way the campaign financing—discussions that we had, the agreement basically was reached to the effect that because of the time frame of the campaign, that is X number of days that we would make our best efforts to raise as much funds statewide as we could and that anything we were short of they would make—would make available to the campaign.

. . . . .

Q. Did you ever discuss with Mr. Morrison why it was that it was requested he sign for some of these notes on behalf of Tennesseans for Tyree, P. Douglas Morrison, Chairman?

A. Did we ever discuss why he did it that way?

Q. Did you ever discuss why it was he was the one that was going to execute the notes in such a fashion?

A. Yes, so that we could acquire the money for the campaign.

Q. Why was Mr. Morrison chosen to sign? Why not yourself or someone else?

A. I don't know. I wasn't here I guess was one reason being and I was scattered from one end of the state to the other. Doug was always here with the exceptions of once in a while.

. . . . .

Q. Were you aware of any meetings that were held by the members of Tennesseans for Tyree as an association meeting to conduct whatever business the association might have?

A. Yes, we had meetings to discuss the arrangements on financing of the campaign.

Q. So, when you say we had those meetings, are you referring to yourself, the Butchers and Barr?

A. Right.

. . . . .

Q. All right, you indicated in your affidavit that the principal members were Jake Butcher, C.H. and Jesse Barr. Principal members. Were there other members of that association?

A. The terminology relates to the—specifically to the—what they were doing and what function they were performing. The principal members be-

2. Morrison could not write checks on the account, which was under the control of Stanley C. Ray, who was designated Treasurer of Tennesseans for Tyree by the candidate pursuant to the Campaign Financial Disclosure Act.

3. T.C.A., § 2–10–102.

. . . . .

(10) "Political campaign committee" means:
(A) A combination of two (2) or more individuals, including any political party governing body, whether state or local, making expenditures, except as provided for in subdivision (3) of this section, to support or oppose any candidate for public office or measure, but shall not include a voter registration program;
(B) Any corporation or any other organization making expenditures, except as provided for in subdivision (3) of this section, to support or oppose a measure; or
(C) Any committee, club, association or other group of persons which receives contributions or makes expenditures to support or oppose any candidate for public office or measure during a calendar quarter in an aggregate amount exceeding two hundred fifty dollars ($250).

ing that they were the ones that arranged the financing and assisted in a portion of the fund raising. The term principal meaning to me that the ones that were—that did that—performed those functions.

Q. All right, let me ask my question again. Do you know of any other members of the association?

A. Because it was an umbrella, in effect, Tennesseans for Tyree, there was—you had your disclosure process, you had the State Treasurer. I don't know who all could have been considered. Perhaps the 516,000 people that voted for me. I don't know where the cut-off point would be. I just know that in terms of the principals sense or the use of that term, it had to do with specific functions that they were performing in the campaign.

· · · · ·

Q. ... If you could, explain for me and elaborate or elucidate that there is a difference between Tennesseans for Tyree of which you spoke in your affidavit ... in this case and the Tennesseans for Tyree of which you spoke earlier which I believe you stated was for disclosure purposes?

A. The name Tennesseans for Tyree originated very, very early in the campaign. Pursuant to State law, you must have a disclosure process when you raise money. We called that committee, in effect, that organization Tennesseans for Tyree. The Tennesseans for Tyree name thus became an umbrella for which there was various and sundry activities that came to pass, all with the objective of getting me elected governor in the State of Tennessee. When I gave the affidavit, because of the nature of the Complaint that was filed against me in this matter, the Tennesseans for Tyree became that umbrella[4] that contained three

individuals, Jake Butcher, C.H. Butcher, Jesse Barr, being the principals, relative to this issue at hand being the notes that came to be as a result of the funding of the campaign as I pointed out in my affidavit. It was for the purpose of raising their function, it was for the purpose of raising a portion of the funds and the financing being the arranging of the loans for the campaign.

· · · · ·

Q. Okay, was Doug [Morrison] a member of Tennesseans for Tyree in any capacity?

A. I don't know. It depends on how you define Tennesseans for Tyree.

In ruling on motions for summary judgments, the trial court and any reviewing court must view all the record in the light most favorable to the opponent of the motion and draw all legitimate conclusions of fact therefrom in the favor of the opponent. *Berry v. Whitworth*, 576 S.W.2d 351 (Tenn.App.1978). If this review reveals disputed issues of material fact, the motion is to be overruled. *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476 (Tenn. App.1978); *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979).

■ The record establishes a disputed issue of material fact as to whether Morrison was a member of Tennesseans for Tyree; also, whether he ratified the transactions out of which the debts arose. The record, likewise, establishes a disputed issue of material fact as to whether defendant Tyree authorized the loans or whether he was a member of the association and ratified the loans.

These disputed issues of material fact render the summary judgments inappropriate, T.R.C.P., 56, and the judgments in favor of Morrison and Tyree are vacated.

■ Finally, it is argued by defendants that the judgment in the United States District Court for the Eastern District of

4. The individuals, Butchers and Barr, did not comply with the filings required of a political campaign committee by the Campaign Financial Disclosure Act, if they, in fact, constituted a separate association.

Tennessee, styled *F.D.I.C., v. Tyree, et al.,* No. 3–83–693, is *res judicata* to the issues in this case. We do not agree. While the federal district court action involved these parties, different contractual obligations were the subject matter of that suit. Moreover, the chancellor did not grant summary judgment on the plea of *res judicata.*

■ We remand to the trial court for further proceedings consistent with this opinion. We note neither plaintiff nor the defendants complied with Rule 6 of the Rules of this court, requiring page citations to the record in their briefs. Accordingly, in our discretion, we tax the costs one-half to plaintiff and one-half to defendants.

PARROTT, P.J., and SANDERS, J., concur.